## W. M. FOREMAN v. TEMPIE GENIE OZMENT, et al.

Eastern Section. September 25, 1925.

Petition for Certiorari denied by Supreme Court, December 14, 1925.

1. **Highways. Pedestrians have right to use a highway and are required to use only ordinary care for their safety.**
There is no imperative rule of law requiring a pedestrian when lawfully using the public ways to be continuously looking or listening to ascertain whether vehicles are approaching under the penalty that upon a failure to do so, if he is injured his own negligence must be conclusively presumed. Pedestrians have the right to assume that the driver of an approaching vehicle will observe the rule of the road.

2. **Highways. Instructions. Instruction on the use of a highway by pedestrians held erroneous.**
Instruction set out in opinion covering the use of highways by pedestrians held properly refused.

3. **Highways. Negligence. Instructions. Jury held properly charged in regard to the use of highways by pedestrians.**
The charge to the jury on plaintiff's negligence in using the highway set out in the opinion and held correct.

Appeal from Circuit Court, Hamilton County; Hon. Oscar Yarnell, Judge.

Affirmed.

Sam J. McAllester, of Chattanooga, for appellant.

Whitaker & Foust, of Chattanooga, for appellees.

SNODGRASS, J. For convenience the parties will be referred to as they were styled in the court below.

These two suits were consolidated and heard together in the court below. Both suits grew out of an automobile accident in an unincorporated suburb of Chattanooga, in which both the husband and wife, T. G. and Tempie Genie Ozment were injured. The wife sued for $25,000, and the husband for $10,000 as damages.

The wife substantially alleges in her declaration that on or about the 10th day of February, 1924, the defendant, W. M. Foreman was the owner and operator of an automobile, and was using and operating the same on Bell avenue, in North Chattanooga, Hamilton county, Tennessee, which, it was alleged, was a much travelled thoroughfare, connecting with and being a part of the Dry Valley road, one of the leading thoroughfares of said county; that on the day and year aforesaid the plaintiff, in company with her husband and other parties, was walking on Bell avenue, going in an eastward direction, about 6:30 p. m., when the defendant, driving his automobile in the same direction, carelessly, negligently, recklessly and wantonly overtook and ran said plaintiff down, running his car into plaintiff from the rear, without sounding any alarm or giving any warning to plaintiff that said car was approaching, knocking the plaintiff, her husband, daughter and son-in-law down, rendering plaintiff unconscious, and that the defendant, without taking any heed of the slaughter he had committed, proceeded on his way as if nothing had happened, rendering no assistance to plaintiff or any of the other persons he had injured; that as a result of said careless, negligent, reckless and wanton driving of said car into plaintiff, both plaintiff's legs were badly broken and mangled above the knees, the bones pressing through the flesh of same, fracturing plaintiff's skull, rendering her unconscious, causing concussion of the brain and seriously affecting and impairing plaintiff's mind, all of which injuries, it was alleged, were permanent, and from which plaintiff had suffered, and still suffers, great physical pain and mental anguish, was confined to the hospital for six weeks or more, had to pay out large sums for nurse hire, doctor's bills and medicine, lost, and still loses very valuable time from her household duties, all of which, it was alleged, was due to the negligence of the defendant as the proximate cause, and without fault upon her part.

Second count: The second count is substantially the same as the first count, except it is alleged in it that the defendant was running and operating his car at the time at a careless, reckless and negligent rate of speed, to-wit, thirty miles an hour, in violation of the statutes of Tennessee regulating the speed of automobiles or motor trucks at not more than twenty miles an hour, and that he was operating said automobile on the wrong side of the street, etc., etc.

The declaration of the husband, T. G. Ozment, was likewise in two counts, substantially the same declaration as that of his wife, except that it related to himself and sued for $10,000 as damages, and excepting in the particulars of the injuries, which were averred to be that he was knocked unconscious, causing concussion of the brain, seriously affecting his mind, and badly breaking and otherwise injuring his right hip, bruising and lacerating his arms, hands, feet

and legs, all of which injuries it was alleged are permanent, causing plaintiff to suffer great physical pain and mental anguish, and to pay out large sums for hospital bills, nurse hire, doctor's bills and medicine; that at the same time the defendant injured plaintiff he also injured the plaintiff's wife, Tempie Genie Ozment, on account of which injuries to his said wife plaintiff has paid out, and continues to pay out, large sums for doctor's bills, nurse hire, hospital bills and medicine, and has lost the services of his said wife in his household, all of which it was averred was due to the negligence of the defendant, as therein alleged, which was the proximate cause of plaintiff's injuries and loss, and without fault upon his part.

To these declarations pleas of not guilty were filed, and the consolidated causes came on for trial before the court and jury, when there was a verdict and judgment in the case of Mrs. Ozment for the sum of $15,000, and in the case of her husband, T. G. Ozment, in the sum of $1,100.

Separate motion for a new trial was entered in each case, and the same being overruled the defendant appealed in each case, and has assigned errors as follows:

1. That the court erred in overruling defendant's motion for a new trial, in that there is no evidence to support the verdict of the jury.

2. That the court erred in overruling defendant's motion for new trial, in that the verdict returned by the jury is against the greater weight of the evidence.

3. That the court erred in overruling defendant's motion for a new trial, in that the verdict of the jury is so excessive as to show the prejudice and caprice of the jury.

4. That the court erred in overruling defendant's motion for a new trial, in that the court failed to grant defendant's motion for peremptory instructions for a directed verdict, which motion was based upon the contributory negligence of the plaintiffs, in that the plaintiffs, who were pedestrians, walking in the street between street intersections, a place where vehicles were expected to be, and pedestrians not to be, and failed to keep a lookout for approaching vehicles from the rear.

5. That the court erred in overruling the defendant's motion for a new trial, in that the court failed to grant defendant's motion for peremptory instructions for a directed verdict, which motion was based upon the contributory negligence of the plaintiffs, who were pedestrians walking in the street between street intersections, a place where vehicles were expected to be, and pedestrians not to be, and were aware of the approach of defendant's automobile from the rear, and failed or neglected to move or take a place of safety upon the sidewalk nearby.

6. That the court erred in overruling defendant's motion for a new trial, in that the court failed to grant defendant's motion for peremptory instructions for a directed verdict, which motion was based upon the contributory negligence of the plaintiffs, in that the plaintiffs, who were pedestrians walking in the street, between street intersections, a place where vehicles were expected to be, voluntarily assumed a position of peril and failed to keep a lookout for approaching vehicles from the rear.

7. That the court erred in failing to charge the jury as follows:

"The law requires that every person shall take due care for the safety of himself and others, according to the circumstances in which he is placed. Automobiles have the right of way on the portion of the highway set aside for them, but at the street and highway crossings must be vigilant, and must be able to stop their cars so as to prevent danger to pedestrians. On the other hand, between street crossings, drivers of automobiles are not held to the same high standard of care, although they must be constantly on the lookout for the safety of pedestrians."

This accident happened on a much travelled, paved thoroughfare of Hamilton county, leading from the City of Chattanooga to Signal Mountain, and in an unincorporated suburb of Chattanooga. The paved thoroughfare or street was about thirty feet wide from curb to curb, and the place or street on which the accident or collision with the plaintiffs occurred was called Bell avenue. This Bell Avenue runs east and west. There are some photographs and a plat filed or attempted to be filed as exhibits to the testimony of T. G. Ozment, but they are not identified as such by any proper authentication of the trial judge. However, it seems from the proof that the plaintiffs lived on what is called Harper street, which runs north and south, intersecting with Bell avenue on the south side, and that some hundred feet farther east what is called May street (also running north and south) intersects Bell avenue on the south side, and that farther east what is known as Snow street intersects Bell avenue on the north side. Between Harper street and May street where the collision occurred, and at places where houses are situated, there are spaces in front that might well answer for a sidewalk, but at intervening places there are occasional spaces where usable sidewalks could be employed by pedestrians on the way, and at times these places were muddy and unfit to be used as sidewalks, so it was the custom of people or pedestrians to use the paved street, from the school children in the neighborhood to all others who might require to pass that way in going to and from places of visitation or employment. A number of witnesses testified that at the time of the collision it was muddy at the places susceptible of influence by the rainfall. The plaintiffs, with their daughter and her husband, about 6:30 p. m., or dark, on February 10, 1924, came

upon Bell avenue from Harper street, and turned east upon the right hand side of the street on their way to church services. They were walking arm in arm, the daughter and son-in-law in front and the plaintiffs following, the wife being on the left side of her husband in the way they were proceeding, and at the place of collision, near the front of the witness Black's house, and near a telegraph pole, were walking in the ditch, or as close to the south curbing as they could walk, when suddenly, without warning other than what might have been predicated by Mrs. Ozment having seen the reflection of a light from an automobile as it approached from the rear just before the collision, and thus being apprised that an automobile was approaching from the rear, all four of these pedestrians were swept down in the street by the automobile driven by the defendant, injuring all four of them. Plaintiff T. G. Ozment was knocked unconscious and considerably bruised and lacerated, while his wife, Tempie Genie Ozment, was terribly and seriously injured. Dr. Revington, the physician who was called to wait upon her, testified as follows:

"I was called to the hospital, and reached there just a few minutes before these people were brought in. After a very hurried glance over the situation it was evident that Mrs. Ozment was the one who had the worst injuries. At that time Mrs. Ozment was absolutely unconscious, and her limbs were just wabbling around any way, and right at the moment I did not know just what type of fracture she had, but on examination of her eyes, etc., it was evident she had a fracture of the skull, and was in a serious condition. Her pulse was very slow and her respiration very bad. So, our immediate attention was turned toward trying to save her life, rather than to worry about her limbs early in the game, rather than to try to save her limbs at that time, temporarily until she overcome the shock. The right thigh bone was fractured in the middle-third, that is about here." (Indicating).

"Q. About five or six inches above the knee? A. About mid-way, and that fracture was compounded, that is, the bone had protruded through the skin, muscle and fat, so it was reduced and put up in a Thomas splint, which is the usual treatment of these kind of cases. The other leg was also fractured at a lower angle, closer to the knee, I should say about five inches approximately above the knee, and also fractured about six inches below the hip joint, and that gave us a loose piece of approximately seven or eight inches, simply knocked clear out, you might say."

"Q. You mean a loose piece of bone? A. Yes, a loose piece of bone between the two fractures. We put this woman up in splints, had fairly good apposition all around, and good alignment, and rushed her off to bed as soon as we could get her there."

"Q. Was she really threatened with dissolution, death? A.

Oh, yes, she looked pretty bad.  I warned her family.  She had incontinence of urine, could not control her urine, due to the injury to the brain, cerebral injury, as a result of that, being a great big fat woman, it was impossible to keep the bed dry.  Her hips and buttocks, back all became excoriated, the skin came off, so it was absolutely necessary to remove those splints, because if we did not, she would simply die from cepsis, and on top of the head condition, it would have taken very little to have killed her.   Then we put on some improvised splints, simply tied her feet to the foot of the bed, and elevated the foot of the bed about two and a half feet, and let her own body pull back against the fractures, and with ordinary open splints tried to hold them in line the best we could, realizing at the time that treatment was not what it might have been under different conditions, but it was a question of saving the woman's life, as I said, in the first place, and worrying about her legs later on, because they could always have something done to them, a little later on we were able to put her up in plaster paris, which she wore for some months after she went home from the hospital, or about three months time.  At the end of that time the fracture of the right femur, right leg, had held in very good shape, with a little shortening, but the allignment was good, her leg was straight.  Her left thigh was badly bowed to the outside, due to the natural muscle pull, and our inability, due to her condition to keep that leg on a tension all the time.  Of course, it was very unfortunate, but as I have explained to the family at the time, we can go back some other time and operate on this leg, which will have to be done as we can, by the accessories we have.  We will have to take out a 'V' in the lower fracture and bring it back straight and another 'V' in the upper portion and bring it back straight.  Both of those can not be done at one time, but will necessitate this woman going to the hospital at two different intervals for approximately six or nine weeks each time, which means at the end of another year we still will just begin to realize the results we can expect to obtain.  Of course, I believe in that case eventually we may have fairly good legs, but as I told the family, there is always a question of infection, a question of these fragments slipping again, and I can not state now, whether this woman will ever have good legs or not, but I can state she will never have as good legs as she had before the injury, due to fact of one leg, leaving it as it is now, will have one inch actual shortening forever, and one of my objects in breaking this one is to be able to remove enough bone so we will not have the leg, so bad now, longer than the good leg now, so all those things have to be taken into consideration.''

"Q. How much shorter is the worse leg now, than the other? A. About three inches. Now, the knees, too, she had very stiff knee, both knees were stiff, and as a result of the plaster of paris we used. Her right knee has some good motion, her left still has a limitation of motion. I do not know how much motion she will have after she has been immobilized in plaster of paris for two more sittings of two or three months each. We had planned to go ahead with Mrs. Ozment about this time with the first series of operations, but on account of this case coming up, she planned to defer it until after this was settled. So, that is all I can state about the case at this time, as I see it."

Further on the doctor stated:

"She had a fracture of the base of the skull, extending from just behind the left ear, clear around the base to the mastoid portion back here, that little cellular portion here." (Indicating).

"Q. Extending practically around the base from ear to ear? A. Almost, yes sir.

"Q. Now, doctor, anyone that has a fracture of the skull, particularly on the back of the head, to the extent that Mrs. Ozment had, and was unconscious for a week, is that fracture liable to give her serious and deadly trouble in the future? A. No, I think not."

And the doctor testified that the fracture had satisfactorily healed. Describing the operation that would be necessary to have a possible or partial correction of the present injuries, he was asked:

"Q. Take the injury to the leg, bowed out here, and especially the upper break, what is the method of operating on that, to try to correct it? A. Well, the method of operating on that is, this: We will have to go in there through a wound, incision down to the bone and expose it, and then take a two inch chisel, I call it a chisel, you can understand that, drive it through the shaft, drive through the other way in the shape of a wedge, take it out, an actual wedge of the bone, then break this out and in doing that, they will break out in a straight line, or approximately straight line, and do practically the same thing down here."

"Q. That entails a vast amount of suffering? A. Yes sir."

Then on recross-examination he was asked:

"Q. Doctor, this operation, in straightening out these fractured limbs, they would be healed to such a point that the use of crutches would be unnecessary, would it? A. You mean afterwards?

"Q. Afterwards. A. I think so, if we get good results."

There was no permanent injury to the plaintiff T. G. Ozment. In referring to his own injuries Mr. Ozment said:

"I was injured in several places, but my worst trouble was my right hip."

"Q. Tell us then first about your right hip. A. Well, it was not a break, but all the ligaments were torn in it, and the doctor said it was worse than a break, only it would not take as long to get well. I was on crutches five weeks, and of course my ankle was sprained and skinned up in several other places, all over my leg."

"Q. It was a mistake in your declaration when I alleged that your head was hurt and you had concussion of the brain? You had no concussion of the brain? A. No sir."

The proof shows that at the time of the injury the automobile was being driven in a zig zag fashion, from one side of the street to the other, and at a rate of speed in excess of twenty miles an hour. One of the witnesses, Carl Martin, a boy who was travelling in the opposite direction and meeting the automobile at the place of the accident, jumped out of the way and was almost run over himself; and in this zig zag fashion the automobile dipped into the plaintiffs, indicating that if it had kept on straight it would have safely passed them in the unobstructed width of the road available to the driver on his left. The defendant claimed that the glare from the headlight of an automobile meeting him at the place was in his eyes, so that he did not see the plaintiffs. But this is not borne out by the proof. And if it had been, it did not excuse the continued operation of the car in that zig zag and rapid fashion, under circumstances when he could not see, and he discredits himself in affecting not to know of the injury he had wrought, claiming he felt only a "jar," and heard nothing which attracted his attention, when the impact was heard by those in the house, and another several hundred feet away.

Another witness, Fred Hill, stated that he was going east on Bell avenue, and this car passed him going in the same direction; that he did not know it was Mr. Foreman's car. He said that the car that passed him was the only car that passed.

"Q. It was the only one that passed you? A. Yes sir.

"Q. There were other cars going toward the tunnel passing you? A. I did not see any other cars at that time.

"Q. There was no other cars going toward the tunnel? Did you see any with bright lights going along there? A. I did not.

"Q. Do you mean to say at the time you were there there were no cars going to or from the tunnel through Stringers Ridge? A. I did not notice any other cars.

"Q. Did not notice any other but this one; that was the only car you noticed on Bell avenue? A. That was the only car that passed me until I got to the people. Of course, others come along and stopped.

"Q. It was dark, was it not? A. Yes sir.

"Q. Pitch dark, about 6:30 at night? A. It was between 6:30 and 7:00.

"Q. You did not notice whether another car was in front of you going in that direction? A. There was not at that time.

"Q. What was causing you to notice the street so carefully? A. The way he was running.

"Q. I say, what caused you to notice the street so carefully, as to whether or not there were any other automobiles on that street or not? A. I said if there were any others on there I did not see them.

"Q. Do you know that car that you saw there was the one that had the collision? A. Yes sir; the same car come by and I noticed the bumpers and extra tire and the cover on it, and that same car come back by after it hit the people, come back up Bell avenue."

He stated that he was about a block and a half away and heard the lick; that the car was running between twenty-five and thirty-five miles an hour, and that it was zig-zagging down the road from one side to the other, and that just as it got even with him it dipped in and almost hit him. He was asked:

"Q. Did you see it dip out and dip back any more after that, before it struck these people? A. Yes sir, I made the remark 'he must be drunk.'

"Q. Did the car appear to make any stop after it struck these people, you say you heard the blow? A. No sir, I do not think it did."

Indeed it was not seriously questioned but what a primary liability was established, but the defense was that of contributory negligence. There is abundant evidence to support the finding of the jury as to the negligence of the defendant causing the injury. Their finding also settles the question of the contributory negligence of the plaintiffs. This was in fact a paved highway, that the plaintiffs had a right to use. It was after dark, and according to their claim it was muddy and inconvenient to travel out of the road. It was wide enough for safe passage by the defendant on the left of the plaintiffs. They were walking in the ditch on the side of the road on the right, next to the curbing. Only Mrs. Ozment saw the reflection of the light before the automobile struck them. They had the right to infer that the driver of the automobile would discharge his duty and observe the law of the road in keeping to the left in passing them.

"There is no imperative rule of law requiring a pedestrian when lawfully using the public ways to be continuously looking or listening to ascertain whether vehicles are approaching, under the penalty that upon a failure to do so, if he is injured, his own

negligence must be conclusively presumed." R. C. L., Vol. 13, page 293, Sec. 243, and authorities cited under Note 17.

"Drivers of vehicles and pedestrians have the right to assume that the driver of an approaching vehicle will observe the rule of the road." Ib., page 290, Sec. 241, and authorities cited under Note 15.

And we might add, to assume also, that if one approaching from the rear needs additional room for passage, he will sound some alarm, instead of sweeping down upon them in the ditch at the rate of twenty-five to thirty-five miles an hour. At least the jury thought that plaintiffs were not under the circumstances guilty of such negligence as would bar their right to recover, and we think the circumstances were such as to justify such finding.

The first assignment of error is therefore overruled.

The second assignment of error, that the verdict is against the weight of the evidence, under our rules is not available here in this kind of a case.

The fourth, fifth and sixth assignments, based upon alleged contributory negligence, for reasons indicated are likewise overruled.

Neither do we think that the court was in error in refusing to charge the request mentioned in the seventh specification. This was simply a paved highway, and while streets had been laid off apparently intersecting the highway, no sidewalks had been constructed, except such as the people living on the highway had made in front of their premises. There had been no part of this highway set apart especially for automobiles. Plaintiffs had as much right upon the highway as the automobile and its driver. There was no changing standard of care. There was only one, and it applied equally to both plaintiffs and defendant, although what would have been ordinary prudence in one circumstance may not have been ordinary prudence in another. The request, therefore, if accurate, had no special application to the facts of this case. The matter was sufficiently covered in the general charge, which applied more accurately to the facts of the case. The jury was told that it was the duty of the plaintiffs to exercise reasonable care for their own safety, such a degree of care as would be expected of ordinarily prudent people situated as they were. That if there was a sidewalk there that was passable, and usable, if an ordinary prudent person would be expected to walk on that sidewalk in traversing that street, then they would be expected to do that; but if there was a custom there and habit among people to walk in the street, if the street was paved and the sidewalks were not, and if this defendant knew that, if he lived in the community and knew that fact, then the question is, whether or not these plaintiffs were guilty of contributory negligence in walking in the street, or whether or not they were acting as reasonable, prudent persons would be expected to act under the circumstances surrounding. They

6 T. A.—35.

were told that if the plaintiffs were guilty of contributory negligence, and if their negligence was what proximately caused the accident, or proximately contributed to it, they could not recover; or if it proximately combined or concurred with the negligence of the defendant in the operation of the car, if they should conclude that the defendant was negligent, either under the common-law count of the declaration or the count based on the statute, then they could not recover. They were told that it was the insistence of the defendant that the plaintiffs ought not to recover; that he insisted first, that he was not guilty; that he was not running the car at a negligent rate of speed; that he was not violating the statute which regulates the speed of automobiles; that he was keeping a lookout ahead, exercising reasonable care to do that; and he insists that the plaintiffs were guilty of such contributory negligence as proximately caused their injuries, in that they were walking in the street there; that they could see, or by the exercise of reasonable and ordinary care they could have known he was coming, and did not get out of the way; that they ought to have been walking on the sidewalk, in a reasonable state of repair, reasonably passable, a place provided for persons to walk, and the fact that they were in the street there, was such contributory negligence as would bar their right to recover; that if the jury should conclude from the evidence in the case that the defendant's contention is true, that they would render a verdict in his favor.

And further, upon the request of defendant, that one voluntarily placing himself in a place of peril must use vigilance for his safety. In other words, that he must use due care, reasonable care to keep a lookout for his own safety; that a pedestrian who walks upon the street or highway between street crossings where automobiles and vehicles are expected to be and there is a sidewalk provided for pedestrians, the pedestrian must maintain a watch or lookout for approaching automobiles.

Under the circumstances we think the charge fairly covered every reasonable insistence that could have been made under the proof, if it did not go beyond it under the indications of the authorities cited, and that the jury was warranted in their finding.

We do not think the verdict under the circumstances was excessive in either case. The woman was thirty-nine years of age, in good health and had a long expectancy. For her to go through life mangled and crippled as she is, and suffer what she has suffered, and will be compelled to suffer, we hesitate very much to say that $15,000 was excessive. Nor do we think the damages should be minimized by the fact that she might possibly have her crippled condition modified by a series of painful and precarious operations. Upon the whole we are satisfied with the verdict of the jury, and it is affirmed in both cases, with costs against appellant.

Portrum and Thompson, JJ., concur.